AO 91 (Rev. 11/11)  Criminal Complaint

**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order

# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

United States Courts
Southern District of Texas
FILED
*March 19, 2021*
Nathan Ochsner, Clerk of Court

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Lee Ray Boykin Jr. | ) | Case No. **4:21mj0579** |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __Aug. 3, 2020 and Aug. 7, 2020__ in the county of __Harris__ in the __Southern__ District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 242  (2 counts) | Deprivation of rights under color of law |
| 18 U.S.C. § 1519  (2 counts) | Destruction, alteration, or falsification of records in Federal investigations and bankruptcy |
| 18 U.S.C § 924(c)(1)(A)  (1 count) | Carry and use of a firearm in a crime of violence |

This criminal complaint is based on these facts:

See attached Affidavit in Support of Criminal Complaint and Arrest Warrant.

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent O'Neil Brown, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __March 19, 2021__

*Judge's signature*

City and state: __Houston, Texas__    Sam S. Sheldon, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, O'Neil Brown, being duly sworn under oath, hereby depose and state:

### I.   INTRODUCTION AND AGENT BACKGROUND

1. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since 2010, and I am currently assigned to the Houston Division. As a Federal Agent, I am authorized to investigate violations of the laws of the United States and execute warrants issued under the authority of the United States. I am currently assigned to the Civil Rights/Law Enforcement Public Corruption Squad, where my official duties include investigating Civil Rights matters, primarily violations related to Color of Law and Hate Crimes. I have investigated these violations since 2011 and have gained knowledge of these types of investigations through training and experience.

2. The statements in this affidavit are based on my personal observations, my training and experience, information obtained from other members of law enforcement, to include written reports, interviews, body-worn camera recordings, and laboratory reports. Since this affidavit is intended to show merely that probable cause exists for obtaining an arrest warrant, it does not set forth all facts discovered during this investigation. Instead, I have set forth the facts necessary to establish that probable cause exists to believe Lee Ray BOYKIN JR. did violate 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law), 18 U.S.C. § 1519 (Destruction, Alteration, or Falsification of Records in Federal Investigations), and 18 U.S.C § 924(c)(1)(A) (Carry and Use of a Firearm in a Crime of Violence).

### II.   APPLICABLE STATUTES

3. Title 18, United States Code, Section 242 makes it a crime for any person acting under color of any law, statute, ordinance, regulation, or custom, to willfully subject any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. Such person shall be fined under this title or imprisoned not more than ten years if **bodily injury** results from the acts committed or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire; and if death results from the acts committed in violation of this section or if such acts include **kidnapping** or an attempt to kidnap, **aggravated sexual abuse,** or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

4. Title 18, United States Code, Section 924(c)(1)(A) makes it a crime for any person, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, to use or carry a firearm, or to possess a firearm in furtherance of any such crime.

1

5.      Title 18, United States Code, Section 1519 makes it a crime for any person to knowingly alter, destroy, mutilate, conceal, covers up, falsify, or make a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under Title 11, or in relation to or contemplation of any such matter or case.

### III.  FACTS SUPPORTING PROBABLE CAUSE

**Victim # 1**

6.      On August 7, 2020, according to police reports, the Houston Police Department (HPD) was notified via a 911 call of a reported sexual assault involving Victim # 1 and a trooper (subsequently identified by law enforcement through investigation to be Lee Ray BOYKIN Jr.). Victim # 1 was interviewed by HPD investigators that same night, and at a later date by the FBI.

7.      According to Victim # 1, on August 7, 2020, she and her common-law husband of 19 years were panhandling at the intersection of W. Mount Houston Road and North Freeway. At around 8:00 p.m., the couple began walking southbound along the North Freeway Service Road to return to their motel room at the Express Inn, located at 9025 North Freeway, Houston, Texas. As Victim # 1 and her husband were walking, their friend, R.H., drove by and stopped to retrieve his (R.H.'s) phone, which Victim # 1 had. Because it was hot outside and she was tired, Victim # 1 got in the front passenger seat of R.H.'s vehicle to get a ride to the Express Inn; however, there was no room in the vehicle for her husband because it was filled with junk. The Express Inn was located about half-a-mile away.

8.      Victim # 1 told interviewers that as she and R.H. were nearing the Express Inn, a marked state trooper patrol vehicle with emergency lights activated pulled them over, with R.H. pulling over in the parking lot of the Express Inn. The state trooper advised R.H. the reason for the stop was the failure to signal a lane change. The state trooper obtained R.H.'s driver's license and issued him a written warning. According to HPD's investigation, the written warning identified the state trooper as L. BOYKIN Jr. (the state trooper is hereafter referred to as BOYKIN Jr.). BOYKIN Jr.'s body-worn camera footage and dash camera footage also captured the initial portions of the traffic stop with video and audio recording. Notably, video footage from BOYKIN Jr.'s body-worn camera showed he manipulated his dash camera, which was linked to his body-worn camera, such that his body-worn camera ceased recording audio. BOYKIN Jr. also deactivated the dash camera. At this point, only the body camera video footage remained recording, without audio.

9.      According to Victim # 1, BOYKIN Jr. returned R.H.'s driver's license and told her to get out of R.H.'s vehicle. BOYKIN Jr. asked R.H. if he was Victim # 1's "John." Victim # 1 told BOYKIN she was not a prostitute, and that she panhandled. BOYKIN told Victim # 1 to get in the front seat of his vehicle, and that he was taking her back to where she was at—W. Mount Houston Road. Victim # 1 stated BOYKIN did not search or handcuff Victim # 1, which is corroborated by BOYKIN Jr.'s video footage.

10.     Victim # 1 told interviewers she was in the front seat of BOYKIN Jr.'s patrol vehicle when she saw her husband entering the parking lot through the tinted windows. BOYKIN Jr. quickly pulled out of the Express Inn parking lot. BOYKIN Jr. made a u-turn at W. Gulf Bank Road driving northbound. BOYKIN Jr. began inputting Victim # 1's biographical information into his in-car computer system. BOYKIN Jr. told Victim # 1 she had a warrant[1] for her arrest, to which she responded, "If you have a warrant, then take me to jail." BOYKIN Jr. kept driving. After BOYKIN Jr. drove past the location where Victim # 1 was originally panhandling—and where she believed BOYKIN Jr. was returning her to—Victim # 1 was very scared. BOYKIN Jr. continued driving. Victim #1 reported that she repeatedly asked BOYKIN Jr. where he was taking her, but he repeatedly told her to "shut up." A review of BOYKIN's radio communications that night revealed that he informed the dispatcher that "the subject has been turned over to Harris County", and to show his status as "10-8," meaning "in service."

11.     Victim # 1 told interviewers that BOYKIN Jr. told her "you're going to suck my dick." Victim # 1 told BOYKIN Jr. she was not a prostitute, and he can take her to jail. Around this time, or possibly when she initially entered BOYKIN JR.'s patrol vehicle, Victim #1 recalled seeing the barrel of a gun in the rear of BOYKIN Jr.'s patrol vehicle. Victim # 1 had also observed the gun on BOYKIN Jr.'s hip. Victim # 1 stated BOYKIN Jr. drove to a back parking lot at 10700 North Freeway and parked by a green dumpster. The drive to 10700 North Freeway is captured on BOYKIN's body-worn camera video and is also confirmed by Global Positioning System (GPS) from his vehicle.

12.     In her interview, Victim # 1 advised she told BOYKIN Jr. there are other women out there that would do this, but that she was not a prostitute. Victim # 1 also told BOYKIN Jr. she wanted nothing to do with this, and that she was married. BOYKIN Jr. stated, "Do you want to go to jail right now? You're going to do what I say," or words to that effect. Victim # 1 advised BOYKIN Jr. exited his patrol vehicle. As mentioned above, BOYKIN Jr.'s body-worn camera footage showed he previously disabled the audio recording function on his body-worn camera. BOYKIN Jr.'s body-worn camera video footage showed he exited his vehicle and walked to the rear of his vehicle. BOYKIN Jr.'s hand then moved near the lens of the body camera, and the picture cut off. Victim # 1 told interviewers what happened next.

13.     Victim # 1 stated BOYKIN Jr. came around to the front passenger area and got her out of the vehicle. Victim # 1 was crying when BOYKIN Jr. told her to get on her knees. BOYKIN Jr. unzipped his pants and produced his penis. BOYKIN Jr. grabbed Victim # 1's head and forced it towards his penis for her to perform oral sex. Victim # 1 was scared because BOYKIN Jr. had his hand on his gun. As BOYKIN Jr. forced Victim # 1 to suck his penis, Victim # 1 advised she felt a choking sensation, like she could not breathe, which caused her throat to hurt.

14.     According to Victim # 1, right before BOYKIN ejaculated in her mouth, he told her not to spit out his semen. Victim # 1 advised as BOYKIN Jr. approached ejaculation, she tried to stop, but he told her to slow down and used additional force by using his hand to keep his penis deep inside her mouth as he ejaculated. Victim # 1 reported this additional force made her gag and

---

[1] Law enforcement later confirmed that Victim #1 had a warrant for a probation violation out of Minnesota for a forged check.

spit out his semen on the ground. Laboratory analysis later confirmed the presence of BOYKIN's semen on the ground near the dumpster as reported by Victim #1.

15. Victim # 1 told interviewers BOYKIN Jr. then put his penis back into his pants and zipped up his pants. Victim # 1 asked BOYKIN Jr. if he was going to take her back because she was on foot, far away from home, and he had brought her there. BOYKIN Jr. told her it was out of the way and he gave her back her cell phone. Victim #1 advised that BOYKIN Jr. first checked her phone to ensure she was not recording before returning it to her. Victim # 1 stated BOYKIN Jr. then told her to "run" as he put his hand on the gun on his hip.

16. Victim # 1 told interviewers she quickly walked away, looking back towards BOYKIN Jr. frequently, fearing BOYKIN Jr. would shoot her in the back. Victim # 1 stated she was very afraid and believed BOYKIN Jr. could kill her and make up an excuse for shooting her because he was a cop.

17. After leaving the immediate area from BOYKIN, Jr., Victim #1 stated she called R.H. because she knew her husband—who did not have a phone—was with R.H. looking for her. Emergency dispatch records showed that at approximately 8:30 p.m. on August 7, 2020, Victim # 1's husband called 911 and requested assistance as his wife told him she had been forced to perform oral sex on a trooper. HPD and the Texas Rangers responded to the incident and investigation commenced. As part of the investigation, Victim # 1, as mentioned above, was interviewed; BOYKIN JR., as discussed below, was interviewed by the Texas Rangers and HPD.

**BOYKIN Jr.'s Account**

18. BOYKIN Jr. was interviewed on August 8, 2020. During the interview, BOYKIN Jr. told interviewers varying accounts of his encounter with Victim # 1. BOYKIN Jr. advised that while on-duty, in uniform, and driving his marked Texas Department of Public Safety (DPS) patrol vehicle, he stopped a vehicle on the North Freeway and the driver pulled into a hotel. BOYKIN Jr. stated he told the passenger (Victim # 1) to get out of the vehicle and get into his marked patrol vehicle. BOYKIN Jr. told interviewers he drove away with Victim # 1 sitting in the front seat of his patrol vehicle.

19. BOYKIN Jr. initially told interviewers that he dropped off Victim #1 without incident and then completed a criminal history search after she exited his vehicle. BOYKIN Jr. later admitted he "lied" and went on to tell the interviewers another account. BOYKIN Jr. stated when he saw Victim # 1 get picked up in the car, he figured she was a prostitute. BOYKIN Jr. stated he drove Victim # 1 behind a building at 10700 North Freeway because the area was secluded. He explained that he was trying to teach her a lesson by driving away with her. He told interviewers that he told Victim #1 she was a "piece of shit" and told her he was tired of prostitutes out there in the streets. BOYKIN Jr. again insisted to interviewers that there was no sexual encounter. Later in the interview, BOYKIN Jr. again admitted that he lied and proceeded to tell investigators that he asked Victim # 1 if she would not mind giving him a blow job. BOYKIN Jr. stated Victim # 1 agreed and said "OK," telling him he was very handsome. BOYKIN Jr. told interviewers he exited his patrol vehicle and walked around to the passenger side. BOYKIN Jr. stated Victim # 1 was kneeling on the concrete in front of him and he pulled out his penis.

4

20. According to BOYKIN Jr., Victim # 1 grabbed his penis and placed it in her mouth. BOYKIN Jr. told interviewers that after about five minutes, he ejaculated in Victim # 1's mouth and she spit it out. BOYKIN Jr. stated when he was done, Victim # 1 walked away while he remained at the location to complete some work. BOYKIN Jr. denied threatening Victim # 1, and stated he did not unholster his handgun, nor did he place his hand on his gun to suggest he would. BOYKIN Jr. stated the incident was consensual.

21. On August 8, 2020, according to police reports, BOYKIN Jr. was arrested on the State charge of Aggravated Sexual Assault. That same day, according to DPS records, BOYKIN Jr. was suspended from duty, his authority as a commissioned DPS law enforcement officer was withdrawn, and a preliminarily determination was made to terminate his employment with the DPS. The investigation into the incident continued.

### Victim # 2

22. According to HPD reports, on or about August 11, 2020, the Texas Rangers identified a potential second victim (hereafter referred to as Victim # 2) of BOYKIN Jr. after GPS and video records showed BOYKIN Jr. was previously located in the back parking lot of 10700 North Freeway on August 3, 2020 following an interaction with Victim # 2. Notably, this was the same location Victim # 1 reported being assaulted.

23. On August 13, 2020, HPD detectives interviewed Victim # 2 who told them about an incident involving a state trooper that occurred on August 3, 2020 around 10:30 p.m. to 11:30 p.m. Victim # 2 told the interviewers she did not know the name of the state trooper at the time of the incident, but subsequently recognized the state trooper from the news and identified him in a photo line-up. Further, based on the physical description Victim # 2 provided to the interviewers, GPS records, and footage from BOYKIN Jr.'s body-worn camera footage, investigators have confirmed that the state trooper Victim # 2 discussed was BOYKIN Jr. (hence, the state trooper Victim # 2 discussed is referenced as BOYKIN Jr.).

24. Victim # 2 told the interviewers she was seated inside her friend's car at a Texaco gas station, when a state trooper vehicle pulled up behind them with lights activated. BOYKIN Jr. told Victim # 2 she had outstanding traffic warrants, and he told her friend to go on as BOYKIN Jr. was going to take Victim # 2 to a substation to talk about her outstanding warrants. A review of BOYKIN Jr.'s activity log report shows that he conducted a name search on Victim #2 on August 3, 2020. According to Victim # 2, BOYKIN Jr. told her she was not under arrest, he would not handcuff her, and to get in the front seat of his vehicle.

25. A review of BOYKIN Jr.'s body-worn camera captured the initial portion of his encounter with Victim # 2 with video and audio recordings. However, the body-worn camera footage showed that after BOYKIN Jr. informed Victim # 2's friend he was free to go, BOYKIN Jr. manipulated his dash camera, which was linked to his body-worn camera, such that his body-worn camera ceased recording audio. At this point, only the video footage remained recording.

26. The video footage from BOYKIN Jr.'s body-worn camera showed BOYKIN Jr. opening the front passenger door to his patrol vehicle and Victim # 2 entering. BOYKIN Jr. then drove Victim # 2 away from the Texaco.

27. In her interview, Victim # 2 stated as they drove on the freeway, she told BOYKIN Jr. her name was checked the week before and she had no warrants. BOYKIN Jr. told her he was going to pull over and verify it. Victim # 2 stated BOYKIN Jr. pulled into the property of a big black office building where it was dark. Video footage from BOYKIN Jr.'s body-worn camera showed BOYKIN Jr. turning off the North Freeway Service Road and turning right onto a street with no other cars seen on that street. Within seconds, the video footage from BOYKIN Jr's body-worn camera ceased. Victim # 2 told interviewers what happened next.

28. According to Victim # 2, BOYKIN Jr. drove to the back of the property and turned the thing off on his chest, turned off his computer, and turned off the headlights. Victim # 2 stated BOYKIN Jr. told her "I know what you do and I want some." Victim # 2 told interviewers she agreed because she was scared.

29. Victim # 2 told interviewers BOYKIN Jr. exited and walked around the back of the vehicle to her as she was by the front passenger side area. BOYKIN Jr. unzipped his pants and pulled his penis out. Victim # 2 stated BOYKIN Jr.'s penis was in her mouth and she began sucking on it. Victim # 2 stated BOYKIN Jr. said "come on and give me some of that good head." Victim # 2 stated BOYKIN Jr. ejaculated in her mouth and she spit it out. According to Victim # 2, BOYKIN Jr. then thanked her and subsequently drove her to a nearby music store and dropped her off. Victim # 2 told interviewers she did not feel she had a choice on whether or not to get into the vehicle with BOYKIN Jr. because he was an officer of the law. Victim # 2 stated she believed BOYKIN Jr. could get away with anything because of his status with the law.

## IV. CONCLUSION

30. Based on the foregoing, I believe there is probably cause to believe that on or about August 7, 2020, in the Southern District of Texas and within the jurisdiction of the Court, LEE BOYKIN Jr. did: (1) while acting under color of law as a DPS state trooper engaged in a sexual act with Victim # 1 without her consent, thereby willfully depriving Victim # 1 of liberty without due process of law, which includes the right to bodily integrity, a right secured and protected by the Constitution and laws of the United States, in violation of 18 U.S.C. § 242; (2) knowingly concealed, covered up, falsified, and made false entries in a record and document, specifically dashboard and body camera video and audio recordings and transmissions, with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of the Federal Bureau of Investigation, an Agency of the United States, or in relation or contemplation of any such matter or case, in violation of 18 U.S.C. § 1519; and (3) knowingly carried and used a firearm, that is a Sig Sauer, 9 mm, serial number 3206TXDPS, during and in relation to, and did knowingly possess that firearm in furtherance of, a crime of violence, for which he may be prosecuted in a court of the United States, that is, the deprivation of rights under color of law as outlined above, in violation of 18 U.S.C. § 924(c)(1)(A).

31. Further, based on the foregoing, I believe there is probable cause to believe that on or about August 3, 2020, in the Southern District of Texas and within the jurisdiction of the Court, LEE BOYKIN Jr. did: (1) while acting under color of law as a DPS state trooper engage in a sexual act with Victim # 2 without her consent, thereby willfully depriving Victim # 2 of liberty without due process of law, which includes the right to bodily integrity, a right secured and protected by the Constitution and laws of the United States, in violation of 18 U.S.C. § 242; and (2) knowingly

concealed, covered up, falsified, and made false entries in a record and document, specifically dashboard and body camera video and audio recordings, with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of the Federal Bureau of Investigation, an Agency of the United States, or in relation or contemplation of any such matter or case, in violation of 18 U.S.C. § 1519.

Respectfully submitted,

O'Neil Brown
Special Agent, FBI

Sworn to me remotely by telephone, in compliance with Fed. R. Crim. P. 4.1, on the 19th day of March 2021.

HON. SAM S. SHELDON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF TEXAS